James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP .
195 Broadway
New York, NY  10007-3189
(212) 513-3200
Telefax:  (212) 385-9010
E-mail:  jim.hohenstein@hklaw.com
         lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
James N. Hood as Liquidating Trustee of the
Oceantrade Corporation Liquidating Trust



08 CV 02357

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES N. HOOD AS LIQUIDATING TRUSTEE OF THE OCEANTRADE CORPORATION LIQUIDATING TRUST,<br><br>       Plaintiff,<br><br>-against-<br><br>DOOYANG SHIPPING LIMITED,<br><br>       Defendant. | 08 Civ.    (   )<br><br>**VERIFIED COMPLAINT** |

Plaintiff, James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust ("Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against defendant, Dooyang Shipping Limited, ("Dooyang" or "Defendant"), alleges, upon information and belief, as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.    At all material times herein, James N. Hood as Liquidating Trustee for the Oceantrade Corporation Liquidating Trust maintained and maintains an address at 285 Highland Avenue, Norwalk, CT, 06854-4017.

3.    On or about October 15, 2005, Oceantrade Corporation ("Oceantrade") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq..*

4.    On or about October 4, 2007, Oceantrade filed a Chapter 11 Plan of Liquidation ("Plan"), which was confirmed by order of the Bankruptcy Court for the Southern District of New York on December 4, 2007 ("Confirmation Order").

5.    Pursuant to the Plan and the Confirmation Order, James N. Hood was appointed as Liquidating Trustee, with full authority to assert, prosecute, and settle all causes of action including, but not limited to, causes of action on behalf of Oceantrade against third parties relating to accounts receivable.

6.    At all times material herein, Oceantrade  was a business entity organized and existing under the laws of the Marshal Islands with a principal place of business at c/o Bulkamerica Corporation, 137 Rowayton Avenue, Rowayton, Connecticut, 06853.

7.    At all times material herein, Bulkamerica Corporation ("Bulkamerica") was agent for Oceantrade under an agency agreement dated August 31, 2001 and engaged in business transactions on behalf of Oceantrade pursuant to that agreement, including the transaction herein.

8.      Upon information and belief, at all times material herein, Dooyang was a business entity incorporated under the laws of South Korea with a principal place of business at Dooyang Building, 170-7, Samsung-dang, Kangnam-gu, Seoul, South Korea.

9.      On or about July 11, 2005 Dooyang, as Owner of the vessel AMBER K (the "Vessel"), and Oceantrade, as Charterer, entered into a charter party for the Vessel ("Time Charter"). A true and correct copy of the Time Charter is attached hereto as Exhibit 1.

10.     Oceantrade agreed to charter the Vessel from the Defendant for a minimum period of four months to maximum period of until January 17, 2004 at Charterer's option (Exhibit 1, line 25) at a rate of hire of US$14,150.00 per day. Exhibit 1, line 126.

11.     The Vessel was described as having 4 x 25 metric fans [tons] SWL electro-hydraulic, single deck cranes located between holds 1-2, 2-3, 3-4, 4-5 and 4 sets of radio controlled grabs of maximum capacity 10 cubic metres which are used by the cranes to load and discharge certain bulk cargoes. Exhibit 1, Clause 46.

12.     The Time Charter provided that *"in the event of disabled cargo handling gear, or insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned thereby . . . If required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which case the Vessel shall remain on hire."* Exhibit 1, Clause 28, lines 295-302.

13.     The Time Charter further provided that *"Charterers have the right to withhold from Charter Hire during the period of this Charter such amounts due to them for off-hire including possible speed and performance claims and Owners' disbursements, but proper supporting statements to be sent to Owners promptly."* Exhibit 1, Rider Clause 60.

14.    Finally, the Time Charter provided that all disputes arising under the Time Charter shall be settled by arbitration in London according to English Law. Exhibit 1, Clause 45, lines 509-516.

15.    The Vessel was delivered to Oceantrade upon sailing from Dileskelesi, Turkey on July 16, 2003 at 2342 hours GMT, and was redelivered to Dooyang on January 8, 2004.

16.    On or about October 19, 2003, Oceantrade, as disponent owner, sub-chartered the Vessel to a third-party ("Sub-charterer").

17.    While under sub-charter, the Vessel's grabs failed to operate properly and Dooyang had to hire one grab from ashore to replace the inoperative grab of the Vessel.

18.    The Sub-charterer subsequently made deductions from the hire due to Oceantrade for offhire resulting from the delays during discharge due the inoperative grab as well as for stevedore standby charges that also were incurred during this time.    Oceantrade made commensurate deductions from hire payable from Oceantrade to Dooyang.

19.    Oceantrade issued its Revised Final Hire Statement on June 17, 2005 showing a balance in Oceantrade's favour of $46,860.65.  A true and correct copy of the Revised Final Hire Statement is attached hereto as Exhibit 2.

20.    Despite Oceanrtrade's request, Dooyang has refused to settle this outstanding balance on the grounds, which Oceantrade disputes, that there is a balance in Dooyang's favour for hire on another vessel.

21.    In accordance with Clause 45 of the Time Charter, Oceantrade's claim for payment of sums due under the Time Charter is subject to London arbitration, which Oceantrade will initiate in due course.

4

22.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration proceedings.

23.    This cause of action accrued on May 27, 2004, and upon information and belief, it will take until at least December 31, 2008 to arbitrate this matter to its conclusion.

24.    Based on the preceding, as best can now be estimated, Oceantrade's total claim against Dooyang is the following:

| | | |
|---|---|---|
| A. | On the principal claim: | $46,860.65 |
| B. | Interest at 6.0% from May 27, 2004 to December 31, 2008: | $12,933.54 |
| C. | Costs (arbitrators fees, etc.): | $25,000.00 |
| D. | Attorneys' fees | $50,000.00 |
| | Total Sought: | $134,794.19 |

25.    Dooyang is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Dooyang Shipping Limited with, upon information and belief, the following financial institutions:  ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; Korea Exchange Bank or any other financial institution within the Southern District of New York.

26.    While all disputes arising out of the Time Charter are to be arbitrated in London, England, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty Claims of the Federal Rules of Civil Procedure, as well as 9 U.S.C. § 8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Dooyang Shipping Limited with the financial institutions noted above in paragraph 25;

2.    That Dooyang Shipping Limited and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.    That judgment be entered in favor of James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust, and against Dooyang Shipping Limited in the amount of $134,794.19; and,

4.    That this Court grant James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust, such other and further relief which it may deem just and proper.

Dated: New York, New York
     March  5 , 2008

                           HOLLAND & KNIGHT LLP

                    By: _____
                           James H. Hohenstein
                           Lissa D. Schaupp
                           HOLLAND & KNIGHT LLP
                           195 Broadway
                           New York, NY  10007-3189
                           (212) 513-3200
                           Telefax:  (212) 385-9010
                           E-mail:  jim.hohenstein@hklaw.com
                                     lissa.schaupp@hklaw.com

                           Attorneys for Plaintiff,
                           *James N. Hood as Liquidating Trustee*
                           *of the Oceantrade Corporation Liquidating Trust*

## VERIFICATION

STATE OF NEW YORK          )
                                              :ss.:
COUNTY OF NEW YORK        )

JAMES H. HOHENSTEIN, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to the Plaintiff is that he is not within the jurisdiction of this Honorable Court.

James H. Hohenstein

Sworn to before me this
5th day of March, 2008

Notary Public

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 2011

# 5086866_v1

8

# EXHIBIT 1

Code Name: **"NYPE 93"**
Recommended by:
The Baltic and International Maritime Council(BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# SSY
### SIMPSON SPENCE & YOUNG
**N E W   Y O R K**



# FIRST ORIGINAL

## TIME CHARTER©
### New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---|
| **THIS CHARTER PARTY**, made and concluded in *Stamford, Connecticut* ........................................ | 1 |
| this ..........................................................*11th* .. day of *July*................................................................ ~~19~~ ..*2003* ....... | 2 |
| | |
| Between *DOOYANG SHIPPING LIMITED*............................................................................................ | 3 |
| .......................................................................................................................................................... | 4 |
| **Owners** of the Vessel described below, and *OCEANTRADE CORPORATION* ..................................... | 5 |
| .......................................................................................................................................................... | 6 |
| .......................................................................................................................................................... | 7 |
| **Charterers.** | 8 |

**Description of Vessel**                                                                                        9

| | |
|---|---|
| Name *AMBER K*.............................................. Flag *Panama* ............................ Built *January 2000* .......... (year). | 10 |
| Port and number of Registry ..................................................................................................................... | 11 |
| Classed *Bureau Veritas* ..................................................... in ......................................................................... | 12 |
| Deadweight *47,282*.............................................................long*/metric* tons (cargo and bunkers, including freshwater and | 13 |
| stores not exceeding ........................................ ~~long~~*/metric* tons) on a salt water draft of *11.778 meters* ........... | 14 |
| on summer freeboard. | 15 |
| Capacity *59,387*..................................... cubic *meters* ~~feet~~ grain *58,239* ................................ cubic feet bale space. | 16 |
| Tonnage *25,955/16,173*................................. GT/*NT* ~~GRT~~. | 17 |
| Speed about *14.0*............................. knots, fully laden, in good weather conditions up to and including maximum | 18 |
| Force *4* ............ on the Beaufort wind scale, on a consumption of about *26.6*....................................... ~~long~~*/metric* | 19 |
| tons of *IFO 380 CST + 2.0 metric tons IFO 380 CST for G/E on the condition of 11.758 M as acantling draft.* . | 20 |

| | |
|---|---|
| * Delete as appropriate. | 21 |
| *For further description see Appendix "A" ~~(if applicable)~~* | 22 |

**1.   Duration**                                                                                                23

| | |
|---|---|
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period | 24 |
| of *Timecharter period of minimum 4 months to maximum January 17th, 2004 in Charterers' option via safe* | 25 |
| *port(s)/safe berth(s)/safe anchorage(s) via worldwide trading always afloat always within Institute Warranty Limits with* | 26 |
| *general harmless cargoes. Charterers to have option to break Institute Warranty Limits in which case Charterers to pay* | 27 |
| *extra insurance premium supported by Owners insurers' invoice not exceeding Londons underwriters standard scale.* | 28 |
| within below mentioned trading limits. | |

**2.   Delivery**                                                                                                29

| | |
|---|---|
| The Vessel shall be placed at the disposal of the Charterers ~~at~~ *dropping last outward sea pilot one (1) safe port Sea* | 30 |
| *of Marmara port in Owners' option (intention Diliskelesi) anytime day or night Sundays and holidays included* | 31 |
| .......................................................................................................................................................... | 32 |
| ....................................................................................................... The Vessel on her delivery | 33 |
| shall be ready to receive *any permissible* cargo with clean-swept, *washed down and dried up* holds and tight, | 34 |
| staunch, strong and in every way fitted | |
| for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear | 35 |
| simultaneously, *see also Clause 72.* | 36 |

| | |
|---|---|
| The Owners shall give the Charterers not less than *7/5/3 and 1*............................. days notice of expected date of | 37 |
| delivery *and keep the Charterers well informed if any changes.* | 38 |

# FIRST ORIGINAL

**3.    On-Off Hire Survey**                                                                            39

Prior to delivery and redelivery the parties shall, unless otherwise agreed, ~~each~~ *jointly* appoint surveyors, for *joint*    40
~~their~~
~~respective~~ accounts, who shall not later than at first loading port/last discharging port respectively, conduct    41
joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition    42
of the Vessel. ~~A single report shall be prepared on each occasion and signed by each surveyor, without~~    43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~    44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~    45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~    46
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.    47

**4.    Dangerous Cargo/Cargo Exclusions**                                                              48

(a)    The Vessel shall be employed in carrying lawful merchandise excluding *those cargoes as described in Clause*    49
*51 and 52* ~~any goods of a dangerous,~~
~~injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~    50
~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~    51
~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~    52
~~pass. Without prejudice to the generality of the foregoing, in addition the following are specifically~~    53
~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials.~~    54
*See Clause 51 and 52.*.................................................................................................    55
.......................................................................................................................    56
.......................................................................................................................    57
.......................................................................................................................    58
.......................................................................................................................    59
.......................................................................................................................    60
.......................................................................................................................    61
.......................................................................................................................    62
.......................................................................................................................    63
.......................................................................................................................    64

(b)    If IMO-classified cargo is agreed to be carried, ~~the amount of such cargo shall be limited to~~    65
~~.............................................~~ ~~tons~~ and the Charterers shall provide the Master with any evidence he may    66
reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO    67
regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at    68
the Charterers' risk and expense.    69

**5.    Trading Limits**                                                                                70

The Vessel shall be employed in such lawful trades between safe ports and safe places *always afloat*    71
*always*
within *IWL with general and harmless cargoes - the Charterers have the right to breach IWL, but if trading outside*    72
*IWL any extra insurance premium to be for Charterers' account. However, in no case shall insurance premium exceed*    73
*rates quoted on the London Underwriters' Standards Scale. The Charterers to have the option to obtain competitive*
*rates Charterers will consult Owners for final confirmation, whenever the vessel will be instructed to call war zone -*
*excluding Lebanon,*
*Syria, Iraq, Iran, Cambodia, Libya, Israel, Cuba, North Korea and gypsy moth infested areas*    74
*includingRussian/Siberian ports and all war and/or warlike zones and countries against whom United Nations*    75
*sanctions may be imposed from time to time* ..................................................... ~~as the Charterers shall direct.~~    76

**6.    Owners to Provide**                                                                             77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for    78
all provisions, *freshwater, drinking water. lubricating oil,* cabin, deck, engine-room and other necessary stores,    79
including boiler water; shall pay for
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the    80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, *holds,* machinery and    81
equipment for and during the service, and have a full complement of officers and crew. *See Clause 69.*    82

**7.    Charterers to Provide**                                                                         83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise    84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory    85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, *customary*    86
pilotages,
towages, agencies, commissions, consular charges (except those pertaining to individual crew members    87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel    88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all    89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew    90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while    91
the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations    92
shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six    93
months or more. *See also Clause 57.*    94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a    95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage *and other equipment*    96
already aboard
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings *if requested by the Owners* at    97
their cost and in
their time. *See Clause 70 and 73.*    98

## 8.    Performance of Voyages    99

(a)    The Master shall perform the voyages with due despatch, and shall render all customary assistance    100
with the Vessel's crew. The Master shall be conversant with the English language and (although    101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards    102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to    103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk    104
and expense, under the supervision *and direction* of the Master.    105

(b)    If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or    106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if    107
necessary, make a change in the appointments.    108

## 9.    Bunkers    109

(a)    The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and    110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:    111
...................................................800........ long*/metric* tons of fuel oil at the price of *U.S. $170.00* ............ per ton;    112
........................................................ tons of diesel oil at the price of *U.S. $270.00* ......... per ton. The vessel shall    113
be redelivered with *about the same quantities/prices as on delivery. Charterers have the option to supply bunker before*    114
*delivery which not to interfere with Owners' operation. Owners have the option to supply bunker prior redelivery*
*provided same does not interfere with Charterers' operation.* ÷..............tons of fuel oil at the price of ...........per ton;
........................................................tons of diesel oil at the price of .................................................... per ton.    115

* Same tons apply throughout this clause.    116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and    117
auxiliaries and which conform to the specification(s) as set out in Appendix A.    118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines    119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed    120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed    121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners    122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker    123
consumption, nor for any time lost and any other consequences.    124

## 10.    Rate of Hire/Redelivery Areas and Notices    125

The Charterers shall pay for the use and hire of the said Vessel at the rate of *U.S. $ 14,150.00* ...............................    126
U.S. currency, daily, *including overtime* or $ ......................-U.S. currency per ton on the Vessel's total deadweight    127
carrying capacity, including bunkers and stores, on ...........................................summer freeboard, per 30-days,    128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part    129
of a *day* month; hire shall continue until the hour of the day of her redelivery in like good order and condition,    130

# FIRST ORIGINAL

ordinary wear and tear excepted, to the Owners (unless Vessel lost) at *dropping last outward sea pilot one (1) safe* | 131
*Aden/Japan range or Continent/Mediterranean range or Beira/Cape Town range port in Charterers' option any time* | 132
*day or night Sundays and holidays included.* ................................................................................................ | 133
.......................................................................................................... unless otherwise mutually agreed. | 134

The Charterers shall give the Owners not less than *30/15/10 and 5* ............................... days notice of the Vessel's | 135
expected date and probable port of redelivery. | 136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be | 137
adjusted to GMT. | 138

**11.    Hire Payment** | 139

(a)    *Payment* | 140

Payment of Hire shall be made *to Owners' nominated bank* so as to be received by the Owners or their | 141
designated payee in
*INDUSTRAIL BANK OF KOREA, SAMSUN YEOK BRANCH - SWIFT CODE: IBKOKRSE / ACCT NO.:* | 142
*131-037588-56-00011 / IN FAVOUR OF: DOOYANG SHIPPING / REF: AMBER K/OCEANTRADE/C/P DTD*
*07/11/2003, viz.*..............................................................................................................................
.......................................................................................................................................................... | 143
.......................................................................................................................................................... | 144
.............................................................................................................................................. in | 145
....................................................... currency, or in United States Currency, ~~in funds available to the~~ | 146
~~Owners on the due date,~~ *every* 15 days in advance, ~~and for the last month or part of same the approximate~~ | 147
~~amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day~~ | 148
~~as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,~~ | 149
~~or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to~~ | 150
~~withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)~~ | 151
~~may otherwise have on the Charterers. See Clause 59.~~ | 152

~~At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the~~ | 153
~~hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold~~ | 154
~~the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever~~ | 155
~~for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire~~ | 156
~~shall continue to accrue and any extra expenses resulting from such withholding shall be for the~~ | 157
~~Charterers' account.~~ | 158

(b)    *Grace Period - See Clause 59* | 159

~~Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors~~ | 160
~~or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners~~ | 161
~~............................ clear banking days (as recognized at the agreed place of payment) written notice to rectify the~~ | 162
~~failure, and when so rectified within those ............................ days following the Owners' notice, the payment shall~~ | 163
~~stand as regular and punctual.~~ | 164

~~Failure by the Charterers to pay the hire within ............................ days of their receiving the Owners' notice as~~ | 165
~~provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.~~ | 166

(c)    *Last Hire Payment - See Clause 60.* | 167

~~Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate~~ | 168
~~payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and~~ | 169
~~the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking~~ | 170
~~into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for~~ | 171
~~the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the~~ | 172
~~balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be~~ | 173
~~refunded by the Owners or paid by the Charterers, as the case may be.~~ | 174

(d)    *Cash Advances* | 175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required | 176
by the Owners, subject to 2 1/2 percent commission and such advances shall be deducted from the hire. | 177

# FIRST ORIGINAL

The Charterers, however, shall in no way be responsible for the application of such advances.                178

## 12.    Berths                                                                                             179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that          180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat    181
at any time of tide, *except at such places where it is customary for similiar size vessels to safely lie aground.*  182

## 13.    Spaces Available                                                                                   183

(a)    The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can          184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the      185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,    186
apparel, furniture, provisions, stores and fuel.                                                             187

(b)    In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the      188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a       189
result of the carriage of deck cargo ~~and which would not have arisen had deck cargo not been loaded.~~ *The*  190
*amount of deck cargo and the method of stowing and securing shall be determined in accordance with the prevailing*
*international regulations and always to the satisfaction of local authorities and the Master.*
*Deck cargo to be at the Charterers' expense including lashing and securing. The Charterers have the right to use any*
*lashing materials on board the vessel free of expense to the Charterers, but the Charterers to replace damaged and/or*
*lost material.*

## 14.    Supercargo and Meals                                                                              191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'       192
risk and see that voyages are performed with due despatch. He is to be furnished with free                  193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of         194
*U.S.$ 10.00* .................................... per day. The Owners shall victual pilots and customs officers, and also, when  195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,         196
Charterers paying at the rate of *U.S. $ 1,200.00 per month pro rata basis* ~~per meal~~ for all such victualling,  197
*entertainment and all cable/communication sharges to the Owners.*

## 15.    Sailing Orders and Logs                                                                           198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing        199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine  200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the     201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,        202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts             203
required by the Charterers shall be in the English language. *See Clause 54.*                                204

## 16.    Delivery/Cancelling                                                                               205

If required by the Charterers, time shall not commence before *15 July 2003* .................................... and should the  206
Vessel not be ready for delivery on or before *21 July 2003*......................... but not later than ..*16:00* ........... hours,  207
the Charterers shall have the option of cancelling this Charter Party.                                       208

### *Extension of Cancelling*                                                                               209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready~~   210
~~for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty~~   211
~~the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is~~      212
~~expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will~~  213
~~cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two~~  214
~~days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date~~   215
~~of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the~~  216
~~Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers~~   217
~~in accordance with this Clause.~~                                                                          218

# FIRST ORIGINAL

**17.  Off Hire**                                                                                      219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency   220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the        221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,         222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless     223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or      224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of        225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back          226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident     227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time        228
of her deviating or putting back until she is again in the same or equidistant position from the destination    229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'       230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,           231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses         232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be            233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and      234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be            235
deducted from the hire.                                                                               236

**18.  Sublet**                                                                                       237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of       238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this        239
Charter Party.                                                                                        240

**19.  Drydocking**                                                                                   241

~~The Vessel was last drydocked.~~ *The vessel has been delivered as a newbuilding from the shipyard January 2001 and*   242
*has not been drydocked.*

*(a)  The Owners shall have the option to place the Vessel in drydock during the currency of this Charter    243
at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for          244
bottom cleaning and painting and/or repair as required by class or dictated by circumstances.               245

~~*(b)  Except in case of emergency no drydocking shall take place during the currency of this Charter~~     246
~~Party.~~                                                                                             247

* Delete as appropriate                                                                               248

**20.  Total Loss**                                                                                   249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or            250
being last heard of) shall be returned to the Charterers at once.                                          251

**21.  Exceptions**                                                                                   252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the     253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always       254
mutually excepted.                                                                                    255

**22.  Liberties**                                                                                    256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels       257
in distress, and to deviate for the purpose of saving life and property.                                      258

**23.  Liens**                                                                                        259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due          260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on        261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be         262
returned at once.                                                                                     263



# FIRST ORIGINAL

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance, which might have priority over the title and interest of the Owners in the Vessel. The Charterers undertake that during the period of this Charter Party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.    264
265
266
267

### 24.    Salvage    268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion.    269
270

### 25.    General Average    271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any subsequent modification thereof, in *the United Kingdom* ................. and settled in *United States* ...............................
currency.    272
273
274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason Clause" as per Clause 31.    275
276
277
278

Time charter hire shall not contribute to general average.    279

### 26.    Navigation    280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, *and handling of cargo claims on behalf of the Owners and the Charterers*
and all other matters, same as when trading for their own account.    281
282

283

### 27.    Cargo Claims    284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent modification or replacement thereof.    285
286
287

### 28.    Cargo Gear and Lights    288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows: *See Clause 69.*    289
.........................................................................................................................................    290
.........................................................................................................................................    291
.........................................................................................................................................    292
providing gear (for all ~~derricks or~~ cranes) capable of lifting capacity as described. The Owners shall also provide on the Vessel *sufficient light* for night work ~~lights as on board, but all additional lights over those on board shall~~    293
294
~~be at the Charterers' expense.~~ The Charterers shall have the use of any gear on board the Vessel. If required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which case the Vessel shall remain on hire.    295
296
297
298
299
300
301
302

### 29.    Crew Overtime    303

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents, the Charterers shall pay the Owners, concurrently with the hire...........................................................per month or pro rata.~~    304
305
306

### 30.    Bills of Lading    307

(a)    The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates    308

# FIRST ORIGINAL

or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the 309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts. 310

(b)    All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall 311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency 312
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master 313
at their request. 314

(c)    Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and 315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for 316
any loss, damage, expense or delay howsoever caused." 317

## 31.    Protective Clauses
318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of 319
lading or waybills issued hereunder: 320

(a)    CLAUSE PARAMOUNT 321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the 322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national 323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall 324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the 325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said 326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such 327
term shall be void to that extent, but no further." 328

and 329

(b)    BOTH-TO-BLAME COLLISION CLAUSE 330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any 331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in 332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against 333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents 334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other 335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the 336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. 337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or 338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or 339
contact." 340

and 341

(c)    NEW JASON CLAUSE 342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage 343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the 344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, 345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the 346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, 347
and shall pay salvage and special charges incurred in respect of the goods. 348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship 349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required, 351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." 352

and 353

(d)    U.S. TRADE - DRUG CLAUSE 354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the 355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested 356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel. 357

# FIRST ORIGINAL

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account and the Vessel shall remain on hire.    358 359 360 361 362 363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    364 365 366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel."    367 368 369

and    370

(e)  ·WAR CLAUSES - *See Clauses 74 and 77.*    371
"(i)    No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any purported governmental organization maintaining naval, military or air forces).    372 373 374 375 376 377

(ii)    If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of....................................................................In addition, the Owners may purchase and the Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, the Vessel shall not be required to enter or remain at any such port or zone.    378 379 380 381 382 383

(iii)    In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities.    384 385 386 387

(iv)    Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the Charterers' account."    388 389

## 32.    War Cancellation    390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: *The United States of America, The United Kingdom, France, Germany, Russia, Norway, Australia, The People's Republic of china, Denmark and the vessels' flag state*    391 392 393
..............................................................................................................................    394
..............................................................................................................................    395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.    396 397 398 399 400 401 402

## 33.    Ice    403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging. Subject to the Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her size, construction and ice class.    404 405 406 407 408 409

# FIRST ORIGINAL

**34.  Requisition**                                                                              410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter    411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid    412
by the said government in respect of such requisition period shall be retained by the Owners. The period    413
during which the Vessel is on requisition to the said government shall count as part of the period provided    414
for in this Charter Party.                                                                        415

If the period of requisition exceeds ........................................................ months, either party shall have the option    416
of cancelling this Charter Party and no consequential claim may be made by either party.         417

**35.  Stevedore Damage** - *See Clause 64.*                                                    418

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all~~    419
~~damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their~~    420
~~agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such~~    421
~~notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent~~    422
~~of such damage.~~                                                                            423

~~(a)    In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew~~    424
~~and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs~~    425
~~of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed~~    426
~~and if required passed by the Vessel's classification society.~~                               427

~~(b)    Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,~~    428
~~before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will~~    429
~~be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for~~    430
~~which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the~~    431
~~Owners' work.~~                                                                              432

**36.  Cleaning of Holds**                                                                        433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~    434
~~voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~    435
~~local regulations, at the rate of ..............................................per hold.~~    436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~    437
~~accepted or passed by the port or any other authority.~~ The Charterers shall have the option to re-deliver    438
the Vessel with unclean/unswept holds against a lumpsum payment of *U.S. $* ..... in lieu of cleaning *See Clause 72.*    439

**37.  Taxes**                                                                                   440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners    441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter    442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding    443
taxes levied by the country of the flag of the Vessel or the Owners). *See Clause 78.*          444

**38.  Charterers' Colors**                                                                      445

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their    446
own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter    447
Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers    448
shall be for Charterers' account.                                                               449

**39.  Laid Up Returns** - *See also Clause 79.*                                                450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their    451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum    452
period of 30 days if on full hire for this period or pro rata for the time actually on hire.     453

**40.  Documentation**                                                                           454

# FIRST ORIGINAL

The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial 456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' 457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. 459

**41.** **Stowaways** 460

(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining 461
access to the Vessel by means of secreting away in the goods and/or containers shipped by the 462
Charterers. 463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained 464
access to the Vessel by means of secreting away in the goods and/or containers shipped by the 465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers 466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all 467
claims whatsoever which may arise and be made against them. Furthermore, all time lost and all 468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account 469
and the Vessel shall remain on hire. 470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to 471
sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a 472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the 473
Vessel. 474

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained 475
access to the Vessel by means other than secreting away in the goods and/or containers shipped 476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including 477
fines, shall be for the Owners' account and the Vessel shall be off hire. 478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel 479
by means other than secreting away in the goods and/or containers shipped by the Charterers, 480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel 481
is released and at their expense put up bail to secure release of the Vessel. 482

**42.** **Smuggling** 483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any 484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. 485

**43.** **Commissions** 486

A commission of *1.00* ...... percent is payable by the Vessel and the Owners to .................................................. 487
*Simpson, Spence and Young New York and 1.00% Mutual Marine* ............................................................................. 488
............................................................................................................................................................................................................. 489
............................................................................................................................................................................................................. 490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter. 491

**44.** **Address Commission** 492

An address commission of *3.75* ............................................................................ percent is payable to *Charterers* 493
............................................................................................................................................................................................................. 494
............................................................................................................................................................................................................. 495
............................................................................... on hire earned and paid under this Charter. 496

**45.** **Arbitration** 497

~~(a)   NEW YORK~~ 498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~ 499
~~subject to U.S. Law:~~ 500

# FIRST ORIGINAL

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their       501
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this          502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with           503
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of          504
Maritime Arbitrators Inc.                                                                                      505

For disputes where the total amount claimed by either party does not exceed US $ ...........................................** 506
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society       507
of Maritime Arbitrators Inc.                                                                                    508

(b)    LONDON                                                                                                  509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree          510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business 511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,           512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No            513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as         514
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder        515
shall be governed by English Law.                                                                             516

For disputes where the total amount claimed by either party does not exceed US $ ...........................................** 517
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime        518
Arbitrators Association.                                                                                        519

*Delete para (a) or (b) as appropriate                                                                        520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions   521
of this clause shall have full force and remain in effect.                                                     522

If mutually agreed, clauses *46*............................ to *87*........................., both inclusive, as attached hereto are fully   523
incorporated in this Charter Party.                                                                           524

This Charter Party is a computer generated copy of the "NYPE 93" form printed by authority of the Association of Ship Brokers & Agents
(USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In
the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved
document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or
damage caused as a result of any discrepancies between the original approved document and this document.



# FIRST ORIGINAL

**APPENDIX "A"**

To Charter Party dated *July 11th, 2003*............................................................................................ 526

Between *DOOYANG SHIPPING LIMITED*.................................................................. Owners 527

and *OCEANTRADE CORPORATION* ...................................................................... Charterers 528

**Further details of the Vessel:** *See Clause 46.* ..................................................................... 529

........................................................................................................................................................... 530

# FIRST ORIGINAL

RIDER CLAUSES TO THE M/V 'AMBER K'
## OCEANTRADE
## CHARTER PARTY DATED JULY 11TH, 2003



**SSY**
SIMPSON SPENCE & YOUNG
NEW YORK

## CLAUSE 46: DESCRIPTION CLAUSE:

## AMBER K

Flag:                          Panama
Nationality of crew:           Philippine : all crew including Master & Chief Engineer

Owners:                        ITF in order
                               Dooyang Shipping Limited
                               Dooyang bldg. 170-7
                               Samsung-dang
                               Kangnam-gu
                               Seoul
                               South Korea

                               C/O Mutual Marine
                               Rm. 618, Haenum Bldg.
                               70-5, Tapeyeongro 2-KA
                               Choong-Ku
                               Seoul 100-102
                               South Korea

                               Managers: Tokumaru Kaiun Co., Ltd.
                               Yokohama Plant Kosetsu Kyodokumiai Bldg.,
                               No. 3-8, 1-chome, Fukuura, Kanazawa-ku,
                               Yokohama,236-0004,Japan
                               Tel: 81 457805683
                               Fax: 81 457805685
                               Tlx: 3822115 TOKUMAR J

Building Shipyard:             Oshima Shipbuilding Co., Ltd., Nagasaki Pref., Japan,
Class, Class Society:          Bureau Veritas, I, 3/3, E, bulk carrier, ALT, ESP, deep sea
Engine/bridge:                 AFT
04)    Singledeck selftrimming bulkcarrier, self-discharger 04)
Loa:                 185.73 meters
Beam:                30.95 meters
depth moulded:       16.40 meters

DWAT/draft/TPC (about):
47,282 metric tons DWAT on meters 11.778 Summer SW- TPC 50.72 MT
46,040 metric tons DWAT on meters 11.553 Winter SW -TPC 50.57 MT
48,528 metric tons DWAT on meters 12.023 Tropics SW -TPC 50.85 MT

# FIRST ORIGINAL



## RIDER CLAUSES TO THE M/V 'AMBER K'
## OCEANTRADE
## CHARTER PARTY DATED JULY 11TH, 2003

### CLAUSE 46: CONTINUED:

| | |
|---|---|
| Constants excluding freshwater: | abt. 200 metric tang |
| Daily fresh water consumption: | abt. 10 metric tang |
| Fresh water capacity: | abt. 300 metric tang |
| Capacity of freshwater evaporator: | abt. 20 metric tang per day |

09) Grain and bale cubic by hold including hatch coaming space:

| | **GRAIN** | **BALE** |
|---|---|---|
| Hold 1) | 11,156 | 10,938 |
| Hold 2) | 12,598 | 12,354 |
| Hold 3) | 11,948 | 11,718 |
| Hold 4) | 12,586 | 12,343 |
| Hold 5) | 11,099 | 10,886 |
| | 59,387 | 58,239 cubic meters |

10)  Speed and consumption:
Laden: abt. 14.0 knots : 26.6 MT/Day IFO (380 CST) + 2.0 MT/Day IFO
(380 CST) (for G/E) (on the condition of 11.758 m as scantling draft)
Ballast: abt. 15.0 knots : 26.6 MT/Day IFO (380 CST) + 2.0 MT/Day IFO
(380 CST) (for G/E)

Main engine: Kawasaki 6S50MC-C MCO 9,550PS x 104RPM

Port consumption:
Idle:  F.O. 2.2 MT/Day + 0.0. 1.0 MT/Day
Working 24 hours (4 gangs):    F.O. 2.2 MT/Day + 0.0. 5.5 MT/Day
                       (3 sets of G/E running at 80% of Max. Output)
G/E:    Oaihatsu Diesel MFG Co. Ltd. 600PS x 720RPM x 3 sets
Generator:    Taiyo Elect.Co. Ltd.
         AC 450V x 60HZ x 3ø, 500KWA x 720RPM x 3 sets
Bunker capacity in metric tons:
Fuel:  1,425 metric tons (excluding sett. & servo tank)
MDO: 106 metric tons (excluding sett. & servo tank)

13)  Ballast tank capacity:
Total 26,768 metric tang including 12,247 metric tang in hold No.3
Ballasting/deballasting capacities:
Ballasting time (Exc H-3):       abt. 9.0 hours
Deballasting time (Exc H-3):     abt. 8.5 hours
Full ballasting time:      abt. 16.5 hours

# FIRST ORIGINAL

## RIDER CLAUSES TO THE M/V 'AMBER K'
## OCEANTRADE
## CHARTER PARTY DATED JULY 11TH, 2003



### CLAUSE 46: CONTINUED:

Full deballasting time:      abt. 16.0 hours
The stripping time is not included in the above deballasting time.
Number of holds: 5

a)   Maximum hold dimensions per hold (L X B X H) excluding corrugations:

| | | | |
|---|---|---|---|
| Hold 1) | 28.8 x | 30.0 x | 16.7 meters |
| Hold 2) | 28.8 x | 30.0 x | 16.7 meters |
| Hold 3) | 27.0 x | 30.0 x | 16.7 meters |
| Hold 4) | 28.8 x | 30.0 x | 16.7 meters |
| Hold 5) | 29.0 x | 30.0 x | 16.7 meters |

b)   Tanktop flat floor dimensions excluding corrugations per hold (L X B):

| | | |
|---|---|---|
| Hold 1) | 28.8 x | 5.1/18.7/20.4 (fore/mid/aft) meters |
| Hold 2) | 28.8 x | 22.1 meters |
| Hold 3) | 27.0 x | 22.1 meters |
| Hold 4) | 28.8 x | 22.1 meters |
| Hold 5) | 29.0 x | 22.1/6.8 (forelaft) meters |

c)   Holds are hoppered.
d)   Vessel has no obstacles 1 obstructions 1 pillars in holds or on tanktops.
e)   Tanktops are suitable for grab discharge.
f)   $CO_2$ are not fitted in cargo holds.
g)   Australian hold ladders 1 compliance WWF regulations.
h)   Natural ventilation for all cargo holds (No. 1 -No. 5)

Gear: Electro-hydraulic driven, single deck cranes 4 x 25 metric fans SWL,
      located between holds 1 -2, 2 -3, 3 -4, 4 -5
      Length of jibs: 27.84 meters

a)   Maximum outreach from ship side and corresponding SWL 25 metric fans.
      Outreach of cranes from ship side: maximum 8.525 meters
      Working radius: minimum 5.0 meters/maximum 24.0 meters
b)   Slewing speed: abt. 0.65 RPM
      Hoisting speed: abt. 12.5 m/min.
      Lufting speed: abt. 35 sec.
c)   Vessel can supply 440 volt 3 phase 60 cycles and 85 kw per crane from
      engine room.

Grabs: 4 sets
a)   Maximum capacity: 10M3
b)   Unit weight: 8.5 metric tons
c)   Radio control opening single rope type

# FIRST ORIGINAL
## RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



**SSY**
SIMPSON SPENCE & YOUNG
NEW YORK

### CLAUSE 46: CONTINUED:

d)   Maker: Tobu Jyukogyo Co., Ltd.

18)   Strength tank tops I weather deck I hatch covers:
a) Maximum permissible weight per hold basis uniform cargo:

Hold 1)   12,900 metric tons
Hold 2)   11,000 metric tons
Hold 3)   19,000 metric tons
Hold 4)   11,000 metric tons
Hold 5)   14,400 metric tons

b)   Maximum permissible local strength (metric tons per square meter) on

|         | tank top | deck |
|---------|----------|------|
| Hold 1) | 20.9     | 2.43 |
| Hold 2) | 14.0     | 3.40 |
| Hold 3) | 25.8     | 3.40 |
| Hold 4) | 14.0     | 3.40 |
| Hold 5) | 21.0     | 3.40 |

On hatch cover:   No. 1 -5: 1.75MT/M2
Cross deck:        No. 1: 1.75MT/M2, Nos. 2 -5: 2.26 MT/M2
Ship has no bulwark, eye plate I chock and stanchion chocks.

Vessel is fitted for carriage of grain in accordance with Chapter VI of Solas 1974 and amendments thereto and able to navigate with minimum two slack holds when loaded with untrimmed ends, without requiring any bagging, strapping and securing.

Vessel is fully fitted for Panama and Suez Canals.

21)   Vessel is strengthened for the carriage of heavy cargoes and suitable for alternate hold loading, holds No. 2 and No. 4 may be empty.

Vessel is not logs / timber fitted.

23)   Distance from waterline to top of hatch coaming:

|                        | First (No. 1) HT | Last (No. 5) HT |
|------------------------|------------------|-----------------|
| Full ballast:          | abt. 12.4 m      | abt. 11.3 m     |
| With hold No.3 empty:  | abt. 15.7 m      | abt. 12.7 m     |

All figures in the above are based on the conditions with 150 metric tons I FO/MDO and 160 metric tons FW.

4

# FIRST ORIGINAL

### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



## CLAUSE 46: CONTINUED:

24)    Distance from keel to vessels highest point: 43.5 meters

Vessel has no centerline bulkhead

Not applicable

Vessel is not on Arab boycott list.

28) Additional information:

a)    Official Number: 28431- T J (Interim)
b)    Number in Lloyds Register: 9200354
c)    Home port: Panama
d)    Call sign: 3FTE9
       Telex: 3 357 782 10
       Phone: 3 357 782 10 1 3 357 782 11
       Fax: 3 357 782 12
       Inmarsat C: 4 357 782 10
e)    GT 1 NT International: 25,955 MT 116,173 MT
       NT Panama: 21,585.00 MT
       GT 1 NT Suez: 27,128.80 MT 124,839.28 MT
f)    P. and I. Club: The Britannia Steam Ship Insurance Association
g)    Name of Underwriters: The Nipponkoa Insurance Co., Ltd., Japan
h)    Insured value: USD 21,000,000 at the time of delivery of the Vessel
i)     Full style of registered owners:
       Amber Ocean Corp.,
       80 Broad Street, Monrovia, the Republic of Liberia
       c lo Sumisho Marine Co., Ltd.
       8-8, Harumi 1-chome, Chuo -ku, Tokyo, 104-0053, Japan
       Tel: 81 351440580
       Fax: 81351440581
j)     Owners' bank style and Account Number:
       Payee: Amber Ocean Corp.
       Bank: Sumitomo Mitsui Banking Corporation, Tokyo Main Office
       A/C No.: 201936
k)    Last drydocked: New building
l)     First Special Survey due: January 2005
M)    Not applicable.
n)    Not applicable.
o)    Vessel is fitted with 2 sets of water cleaning equipment for cargo holds.

# FIRST ORIGINAL
### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



SSY
SIMPSON SPENCE & YOUNG
N E W   Y O R K

### CLAUSE 46: CONTINUED:

Vessel particular details as stated above, with specific regard as to vessels' LOA/ Beam/draft, maximum deadweight, deadweights and relevant drafts, cargo holds cubic, constant, cargo handling gear, performance at sea, consumption in port, flag, Glass, Glass Society and P and I Club, are guaranteed by the Owners for the entire duration of this Charter and are conditions of this Charter.

### CLAUSE 47: HULL & MACHINERY INSURANCE:

Owners on delivery to declare vessels' hull and machinery value. Owners to advise Charterers immediately of any alterations thereto, otherwise Owners to remain responsible for any/all consequences of such omission. Hull and Machinery value U.S. $21,000,000.00.

### CLAUSE 48: GRAB SUITABILITY:

The vessels' cranes to be suitable for mounting of grabs for loading and discharging operations. Charterers have the right to use vessels' own grabs.

### CLAUSE 49: CEMENT FEEDER HOLES/SOCKETS:

Charterers have the option to burn holes on hatches so as to facilitate loading operation of bulk cement.
Charterers, subject to the Masters' approval which not to be unreasonably withheld, have option to fit/weld any additional equipment and for fitting, loading, discharging and/or securing cargo provided work is done under following terms:

1)      Charterers should give prior notice of above fitting/welding to Owners and Master.

2)      Welding is allowed on tank top except on top of fuel oil tanks.

3)      All fitting / equipment are removed prior to redelivery of the vessel, if Owners/ Master required.

4)      Burnt painting on deck / reverse side of deck including topside tank due to fitting, welding and removing to be repainted originally.

# FIRST ORIGINAL



### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003

## CLAUSE 49: CONTINUED:

5)   All workings of above to be done at Charterers' time/arrangement/expenses/ risk and responsibility with Masters'/Owners' satisfaction and approval of Classification Society. If the approval of Class is required relevant expenses to be for Charterers' account.

## CLAUSE 50: AUSTRALIAN HOLD LADDERS/GEAR:

Australia and New Zealand are included in the trading areas under this Charter Party, and Owners undertake that prior to delivery and throughout the currency of this Charter Party the vessel complies with hold ladder construction and gear/equipment certification requirements as stipulated at any time in the respective ports.

## CLAUSE 51: CARGO EXCLUSIONS:

Owners confirm scrap always allowable cargo.   Owners confirm will allow Charterers to have minimum 2 each of scrap/salt/sulphur/petcoke/cement as allowable cargos during Charter.

Otherwise as per below:

Livestock, petroleum and petroleum products (but petcoke an allowable cargo), pitch in bulk, tar in bulk, salt in bulk(see below), sulphur(see below), asphalt, arms and ammunition, dangerous and/or in flammable goods, explosives, radioactive goods, acids, wet hides, calcium carbide, ammonium nitrates (but it is understood that ammonium nitrate fertilizer grade is an allowable cargo under this Charter Party), steel scrap, logs(see below) and direct reduced iron pellets, fishmeal, turnings.

(I)   Charterers are allowed to load loose logs not exceeding 2 tons per unit in cargo holds and on deck, and also are allowed to carry on weather deck and hatch covers pulplogs in bundles at the following conditions:

1)   Any fittings and/or lashing materials required for carrying logs to be supplied at Charterers' risk, time and expenses. Eventual lashing points and sockets welded on weather deck and hatch covers are to be removed and discharged by Charterers at their risk, time and expenses, latest prior redelivery of the vessel, if so wanted by Owners in accordance with Clause 49.

2)   Cargo on deck and hatch covers not to exceed the vessel's permissible weight per square meter under the vessel's description.



# FIRST ORIGINAL
### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11ᵀᴴ, 2003



**SSY**
SIMPSON SPENCE & YOUNG
NEW YORK

## CLAUSE 51: CONTINUED:

3)   Charterers to take all steps to avoid logs' damage to the vessels' deck equipment and may authorize the Master to arrange proper fencing and/or protector to minimize risk of damage.

4)   Charterers, at their risk, time and expense, to keep space for crews' safety passage between cargoes on deck/hatch covers, which is to the satisfaction of local unions' rule and ports control regulation.

(II)  Charterers to have the right to load each cargo stated below ("Specified Cargo") only 2(two) times per each 12 months period, provided however, that Charterers not to load any Specified Cargo as 3 (three) consecutive or more cargoes and Charterers shall load a cargo or cargoes other than the Specified Cargo after 2(two) consecutive loading of the Specified Cargo.

Charterers always to comply with sub-clause (III) below for respective loading of the Specified Cargo.

Non-oily motor blocks shall be always to the satisfaction of surveyor and Master can refuse oily motor blocks which surveyor so acknowledged. When loading scrap stevedores to use all care to lay down first cargo at each hold as close as possible to tank tops in order to make a proper 3-4 feet high cushion to prevent cargo damages into tank tops.

(III) In the event that sulphur and/or salt is loaded, Charterers undertake to pay for the following steps :-

(A)  Prior to loading :
     - depending on the standard of holds coating partially lime wash holds (this is done generally up to a level equal to the top of the cargo to be loaded)

(B)  After discharging :
     - sweep and washdown holds
     - rinse and flush bilges and bilge lines with fresh water
     - carry pit lime-removal with assistant of vessel's crew as per Clause 53.

Petcoke, Cement, Salt and Sulphur not to be last cargo.

Steel cargoes to be sufficiently dunnaged/lashed/secured and unlashed/unsecured at Charterers' expense, risk and in their time by stevedores under the supervision of the Master and up to his satisfaction.

8

# FIRST ORIGINAL

RIDER CLAUSES TO THE M/V 'AMBER K'
OCEANTRADE
CHARTER PARTY DATED JULY 11TH, 2003



## CLAUSE 51: CONTINUED:

Owners may appoint an independent surveyor to perform a preloading survey of the cargo at their time and cost. Owners will provide Charterers with a copy of the survey report if Owners ordered preloading survey as aforesaid and Owners' P and I Club consented and cargo claim presented.

First layer of scrap in each hold to be released as close as to tanktops so as to provide a cushion flooring for the balance of the cargo under Masters' supervision and to his reasonable satisfaction.

## CLAUSE 52: DANGEROUS CARGO:

If I.M.O. classified cargoes are carried, Charterers/Shippers shall provide the Master with any evidence he may reasonably require to show that the cargo is packaged, labeled, loaded and stowed in accordance with I.M.O. regulations, failing which the Master is entitled to refuse to load it.

## CLAUSE 53: LIME WASHING:

Charterers to instruct crew to limewash the vessels' hold prior to loading and to thoroughly clean the holds with freshwater after discharge to the satisfaction of the Master. Charterers to provide time and all necessary equipment and pay U.S. $200.00 per hold to Owners in addition to the payment stipulated in intermediate hold cleaning clause. All time and expense to be for the Charterers' account. Should local shore regulations not permit limewashing by crew shore labour to be for Charterers' account.

If crews assist to carry out lime-removal, Owners are not responsible for passing hold survey for loading of next cargo due to residue of lime, provided that crews' work to be done in the same efficient manner as if the vessel was trading for Owners' account but without responsibility and liability on part of Owners regarding acceptance of vessel at loading port if vessel is rejected due to residue of lime under this clause.

## CLAUSE 54: WEATHER ROUTING:

Charterers may supply Oceanroutes or Fleetweather advice to the Master, during voyages specified by the Charterers. The Master to comply with the reporting procedure of the routing service, but it is understood that final routing is always at Masters' discretion. For the purposes of this Charter Party ((good weather

9

# FIRST ORIGINAL

## RIDER CLAUSES TO THE M/V 'AMBER K'
## OCEANTRADE
## CHARTER PARTY DATED JULY 11ᵀᴴ, 2003



**SSY**
SIMPSON SPENCE & YOUNG
N E W   Y O R K

### CLAUSE 54: CONTINUED:

conditions)) are to be defined as weather conditions in wind speeds not exceeding Beaufort Force 4. Evidence of weather conditions to be taken from the vessels' deck log and independent Weather Bureau Reports. In the event of a consistent discrepancy between the deck logs and independent Weather Bureau Reports the independent Weather Bureau Report to be taken as ruling.

### CLAUSE 55: PREVIOUS TRADING/BLACKLISTING:

Owners warrant that vessel is not blacklisted by any Arab Authorities.

### CLAUSE 56: LIGHTENING/TOPPING OFF:

Charterers have the right to consign the vessel to safe places or anchorages where lightening or topping off customarily takes place, and Owners agree that the vessel shall engage in lightening or topping off operations at the places or anchorages referred to. Fendering of the vessel to be in accordance with Masters' requirement, and to be supplied and paid for by the Charterers. However, any fendering equipment on board to be at the disposal of the Charterers, free of charge. See Cl. 87.

### CLAUSE 57: DERATISATION CERTIFICATE:

'Vessel to have valid Deratisation Certificate and/or equivalent Fumigation Certificates on board at time of delivery, the validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### CLAUSE 58: BUNKERING PRIVILEGES:

It is understood that vessel has full bunkering privileges at all usual bunkering ports including U.S. ports and is not restricted due to previous trading.

Charterers have the privilege of bunkering the vessel prior to delivery of the vessel provided same does not interfere with Owners' operations, and any time lost and any extra expenses incurred to be for Charterers' account. Owners to have similar privilege prior to redelivery on same conditions. (See Clause 9)



10

# FIRST ORIGINAL

### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



## CLAUSE 59: HIRE PAYMENT HIRE PAYMENT TO BE MADE TO:

Notwithstanding anything contained herein to the contrary, if at any time during the currency of this Charter hire shall become due on or during a Saturday, Sunday or a National Holiday, or outside normal office hours, or at any time which for reasons beyond their reasonable control prevents Charterers from effecting payment of hire on the due date, payment of hire may be made on the next banking day immediately following the date on which hire becomes due.

Where there is any failure to make hire payment on the due date because of an oversight or negligence or error or omission of Charterers' employees, bankers or agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners four banking days' notice to rectify the failure, where so rectified the payment shall stand as a punctual and regular payment.

First hire plus bunker on delivery value to be paid within 3 banking days after vessels' delivery.

## CLAUSE 60: CHARTER HIRE WITHHOLDINGS:

Charterers have the right to withhold from Charter Hire during the period of this Charter such amounts due to them for off-hire including possible speed and performance claims and Owners' disbursements, but proper supporting statements to be sent to Owners promptly. Charterers have the right to withhold from last months' hire Owners' estimated advances and disbursements including any fines and any other amounts to be for Owners' account when effecting hire payments.

Charterers are entitled to deduct value of estimated quantity of bunkers on redelivery and Owners disbursement U.S. $500.00 per port from last sufficient hire payment as well as bunker on redelivery.

## CLAUSE 61: HUSBANDRY MATTERS:

Charterers agree that their offices and/or agents will deliver crew mail free of charge and assist the Master over minor husbandry matters, deducting from hire payments the actual costs involved. For major ships' husbandry matters such as drydocking, cash to Master, changes of major part of crew etc., Owners will make their own arrangement with agents.



# FIRST ORIGINAL



### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003

## CLAUSE 62: STEVEDORE ACCOMMODATION AND EQUIPMENT:

Charterers to have the right of placing stevedores on deck together with their cooking utensils if required and vessel to supply them daily with their requirements of fresh water for washing, cooking and drinking purposes. Charterers also to have the right, if required, to put on board vacuvators and/or oil for operating same and mechanical operators and to have the right to transport same between shore and vessel or vice versa whenever required, provided always in Charterers' time and at Charterers' expense.

## CLAUSE 63: BULLDOZERS AND EQUIPMENT IN HOLDS:

Charterers to have the right to use bulldozers, tractors and/or similar equipment in vessels' holds, as deemed necessary, but in any case not to exceed permissible weight per square meter on deck.

## CLAUSE 64: STEVEDORE DAMAGES:

Stevedores, although appointed by Charterers, shippers, receivers or their agents, to be under the direction and control of vessels' Master. All claims for damages to the ship, allegedly caused by stevedores at loading and discharging port, to be settled directly between Owners and stevedores, and Master is to notify stevedores and Charterers of damages, if any, in writing within 24 hours after occurrence or latest prior to the vessels' departure. Charterers are to lend their assistance to Owners in trying to obtain settlement from stevedores. Charterers to remain ultimately responsible for settlement of stevedore damage.

## CLAUSE 65: BOYCOTT:

In the event of loss of time due to strike, lockout, labour stoppages or boycott of the vessel by shore labour or arising from Government restrictions by reason of vessels' flag or the terms and conditions under which the Master and/or Officers and/or Crew are employed or by reason of vessels' present ownership, or of previous trading of this vessel or of previous or present trading of any other vessel under same ownership, operation, management or control, payment of hire shall cease for the time thereby lost and Owners to pay losses occasioned thereby.

12

# FIRST ORIGINAL

### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



## CLAUSE 66: ARREST CLAUSE:

Should the vessel and/or her Master and/or any of her Officers and Crew and/or any person traveling on board the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have claim against or any interest in the vessel and/or said Master and/or Officers and Crew and/or any person traveling on 'board the vessel, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed as the result of such arrest or is delayed in any way due to the detention or restraint of Master, Officers or Crew etc., and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter Party and vessel to be off-hire for any time actually lost.
This clause shall be inoperative should the arrest be caused through any omission of the Charterers.

## CLAUSE 67: FINES:

Any fines imposed on the vessel, Owners, Master, Officers or members of the Crew or on Charterers originating from Master, Officers or Crew contravening local Port and/or Customs Regulations, particularly as regards smuggling, to be for Owners' account and Charterers are not to be responsible for any consequence resulting from such offense. Any time lost due to above circumstances to be for Owners' account and to be deducted from hire.

## CLAUSE 68: I.T.F.:

The Owners of the vessel guarantee that the minimum terms and conditions of employment of the Crew are now or will be, prior to the presentation of the vessel for loading, and will remain for the period of the Charter Party covered by an I.T.F. Agreement or a Bona Fide Trade Union Agreement acceptable to the I.T.F., failing which vessel to be off-hire for any time lost and any extra expenses to be for Owners' account.

## CLAUSE 69: CARGO GEAR COMPLIANCE:

Vessel to hold international cargo gear certificate valid for the entire duration of the Charter.   Owners also warrant that through the duration of this Charter, cargo handling gears will be in compliance with latest Safety Regulations in force at any time in the countries where the vessel is allowed to trade. 

13

# FIRST ORIGINAL
## RIDER CLAUSES TO THE M/V 'AMBER K'
## OCEANTRADE
## CHARTER PARTY DATED JULY 11TH, 2003



### CLAUSE 69: CONTINUED:

Owners shall maintain the cargo-handling gear of the ship which is as follows; as per Clause 28, providing gears, ropes and blocks and power for all cranes / grabs capable of lifting capacity as described. The Charterers shall have free use of any cargo handling gear on board the vessel. If required by Charterers, the vessel shall work day and night and all cargo handling gear shall be at Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or insufficient power to operate the same, the vessel is to be considered to be off-hire to the extent that time is actually lost to the Charterers and Owners to pay stevedores stand-by charges and Charterers' actual losses occasioned thereby except such a breakdown caused by Charterers, their agents, servants and any person acting on behalf of Charterers. If required by Charterers, the Owners to provide and bear the cost of hiring and working shore cargo handling gear(s) in lieu thereof, which case the vessel shall not be off-hire but for the time actually lost.

### CLAUSE 70: CHARTERERS' EQUIPMENT:

The Master is to keep a record of all Charterers' gear, equipment, dunnage and/or stores supplied to the vessel and to maintain same in good condition. Such gear, equipment, dunnage and/or stores to be returned to Charterers prior to redelivery of vessel to Owners, or if requested by Charterers at any time during the period of the Charter, in like good order and condition as supplied (fair wear and tear excepted), Owners to make good any shortage and/or damage unaccounted for.

### CLAUSE 71: VESSELS' SERVICES:

The following services are included in the hire and shall be rendered by the Master, Officers and Crew without Charterers paying any additionals:

> Raising and lowering of cranes and/or gangways in preparation of loading and discharging.

> Opening and closing of hatches in connection with loading and discharging.

> Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging,

> Supervision and responsibility for loading and discharging and everything related hereto.

14

# FIRST ORIGINAL

## RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



**SSY**
SIMPSON SPENCE & YOUNG
NEW YORK

### CLAUSE 71: CONTINUED:

Maintaining sufficient electric power on all cranes whilst loading and discharging,

(f)   Shifting vessel during loading and discharging and shifting berth.

(g)   Docking and undocking in connection with loading/discharging cargo or bunkering

(h)   Necessary assistance in the vessels' bunkering operation.

(i)   Officers and Crew to shape up vessels' hatches and cranes, grabs and grab connecting devices, if any, as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations.

(j)   If required by Charterers and local regulations and local union permit, vessel to provide one craneman per crane to work crane I grab day a night, however total work not to exceed 32 hours per day (calculated by taking the number of hours taken multiplied by the number of grabs used). Charterers to deal and settle directly with Master as regard recompense for such work which in any case not to exceed a compensation of U.S.$ 5 per hour tons of cargo handled. Crew craneman to be regarded as Charterers' servant and to work at Charterers' risk and to work at the best of their abilities as if working were for Owners' account but Owners/Master/crew are not to be responsible for efficiency of cargo work.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the services to be rendered by Officers and Crew in accordance with the maritime code of the country under whose flag the vessel sails or in accordance with what is customary practice in the trade - see also Clause 73.

### CLAUSE 72: HOLD CLEANING:

Hold cleaning between voyages to be performed by Crew if required by Charterers and if permitted by local regulations, Charterers paying U.S. $4,500.00 lumpsum including removal/disposal of lashing material/dunnage/debris or U.S. $ 5,000.00 lumpsum for dirty cargoes.

15



# FIRST ORIGINAL

### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



## CLAUSE 72: CONTINUED:

Intermediate hold cleaning U.S. $600.00 per hold used for normal cargo and U.S. $1,000.00 per hold used for dirty cargo.

Time used for such cleaning to count as time on hire.

Vessels' holds on delivery and/or prior vessels arriving 1st loadport to be clean/swept/washed down with freshwater and dried up so as to receive Charterers' intended cargo in all respects, free of salts, rust scales and previous cargo residue to the satisfaction of on-hire surveyor. If vessel fails to pass any hold inspection/test as above, the vessel should be placed off-hire from failure until the vessel pass the same inspection/test again.

## CLAUSE 73: LASHING DUNNAGE:

Notwithstanding Clause 70 vessels' crew to assist in lashing/unlashing/relashing, including erecting/removal of stanchions, if/when required by the Charterers. Vessels' crew also to remove dunnage if/when requested by the Charterers.

For such work Charterers to pay directly to the crew as follows U.S. $ 1,500.00 top lashing (or pro rata)

USD 500    Place hog lashing (or pro rata)

USD 500    Remove the hog lashing (or pro rata)

USD 500    Remove the top .lashing (or pro rata)

USD 500    Place wooden stanchions (or pro rata)

USD 500    To remove wooden stanchions (or pro rata)

USD 500    To remove catwalk

USD 500    For relashing total deck load (or pro rata) Removal of dunnage to be considered as part of regular cleaning.

16

# FIRST ORIGINAL



## RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003

### CLAUSE 74: PROTECTIVE CLAUSES:

Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, C.S.U.K. Clause Paramount, wherever applicable, shall be deemed to form a part of this Charter Party and shall be contained in all Bills of Lading issued hereunder. In countries where none of the aforesaid clauses apply, the governing rules of the country of cargo origin or country of loading to apply. Baltime War Clause also to form part of this Charter Party and to be included in all Bills of Lading issued hereunder.

### CLAUSE 75: FINANCIAL RESPONSIBILITY:

Vessel shall at all times have a valid Certificate of Financial Responsibility under U.S. Government Regulations enabling her to use the navigable waters of the United States of America. Owners also undertake to comply with any Law or Regulation in force at any place to which the vessel may be ordered concerning oil pollution or other pollutions.

### CLAUSE 76: P & I COVERAGE:

Owners to maintain full P & I entry during the Charter Party period and Charterers to have the benefit thereof as far as rules permit.

### CLAUSE 77: WAR RISK INSURANCE:

Premium for basic War Risk Insurance on hull and machinery and Officers/Crew and premium for basic blocking and trapping and loss of hire insurance always to be for Owners' account. Any additional premium in respect of such risks and insurance solely arising from Charterers ordering the vessel to proceed to areas currently designated as Excluded Areas by vessel's War Risks Underwriters to be for Charterers' account, however, not to exceed what would have been quoted or charged if the vessel was covered with Lloyd's London. If Owners have not covered basic War Risk Insurance, Timecharterers only to pay the differential of the amount as if they had done so and only against presentation of Underwriters' original invoice.

### CLAUSE 78: EXTRA INSURANCE:

Any extra insurance/expenses by reason of vessels' class, flag, registry, ownership, Officers or Crew to be entirely for Owners' account.



17

# FIRST ORIGINAL



## CLAUSE 79: LAY-UP (SEE ALSO CLAUSE 39):

Charterers to have the right to order the laying-up of the vessel at any time and for any period of time at a safe berth, and in the event of such lay-up the Owners shall promptly take steps to effect all the savings in operating costs including insurance which may be possible and give prompt credit to the Charterers in respect of all such savings. At the request of the Charterers, at any time, the Owners shall furnish an estimate of the savings, which would be possible in the event of a laying-up of the vessel for long periods only.

Should Charterers decide that for reasons of economy Officers and Crew should be paid off, then the cost of repatriation and later, cost of rejoining, including laying-up preparation and reactivation cost and any expenses related thereto are to be for Charterers' account. Charterers to give sufficient notice of their intention in this respect to enable Owners to make necessary arrangements for decommissioning and recommissioning. Lay-up site to be mutually agreed.

## CLAUSE 80: BILLS OF LADING/RELEASE OF CARGO WITHOUT ORIGINAL BILL OF LADING:

Notwithstanding the provisions of Clause 30, Master and Owners authorize the Charterers, Sub-Charterers or agents to sign Bills of Lading in accordance with Mates' or Tally Clerks' receipts endorsed by Chief Mate on board, for and on behalf of Master if so required by Charterers. If, during the currency of this Charter Party, if original Bill(s)of Lading are unavailable at discharge port, entire cargo should be released against Charterers' single L.O.I. in Owners' P&I Club wording with only Charterers' signature.

To the Master/Owners of the M/S ...

(Description of goods and B/L markings)

In consideration of your complying with our request to deliver the cargo to us without production of the original Bills of Lading, we hereby agree as follows:

To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss or damage of whatsoever nature which you may sustain by reason of delivering the goods to us in accordance with our request.



18

# FIRST ORIGINAL

### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11ᵀᴴ, 2003



## CLAUSE 80: CONTINUED:

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the goods as aforesaid, to provide you or them from time to time with sufficient funds to defend the same.

3.  If the vessel or any other vessel or property belonging to you should be arrested or detained or if the arrest or detention thereof should be threatened, to provide such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property, and to indemnify you in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.

4.  As soon as all original Bills of Lading for the above goods shall have arrived and/or come into our possession, to produce and deliver the same to you whereupon our liability hereunder shall cease.

5.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

6.  This indemnity shall be construed in accordance with English Law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

## CLAUSE 81: ARBITRATION SMALL AMOUNTS:

If the amount in dispute does not exceed the amount of U.S. $ 25,000.00 exclusive of any interest on the amount claimed, costs of the arbitration, and legal expenses, if any, the Owners and the Charterers agree that the matter should be heard under the Small Claims Procedural 1989 Terms in accordance with LMAA Rules, English Law to apply.

## CLAUSE 82: USCG CLAUSE:

Owners confirm that vessel not listed an USCG List due to;



a) Flag
b) Ownership
c) Classification
d) Vessels' boarding history

19

# FIRST ORIGINAL



### RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11ᵀᴴ, 2003

## CLAUSE 82: CONTINUED:

e) Outstanding items found by USCG during earlier inspections

In case vessel is detained by any US Authority due to above reasons or new incidents involving US Authorities, Owners are responsible for any additional expenses involved in having cargo delivered to receivers without delay.

## CLAUSE 83: GYPSY MOTH CLAUSE:

The Owners guarantee that the vessel is not categorized as "high risk vessel" and/or "low risk vessel" defined by the Canadian and/or US Government(s) regarding Asian Gypsy Moth infested.

## CLAUSE 84: HATCH COVERS:

Owners warrant that the vessels' hatch covers to be strictly watertight all throughout this Charter Period, and if any hatch cover found detective, same to be immediately rectified at Owners time and expense to Charterers' satisfaction. Charterers' also have the right to carry out hose test on all hatches at any time during this Charter.

## CLAUSE 85: BIMCO DOUBLE BANKING CLAUSE:

(A)    The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging cargo and/or bunkering.

(B)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(C)    Without prejudice to the generality of the Charterers' rights under (A) and (B), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe to do so

(D)    The Owners shall be entitled to insure any deductible under the vessels' hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessels' hull policy. 

20

# FIRST ORIGINAL

RIDER CLAUSES TO THE M/V 'AMBER K'
OCEANTRADE
CHARTER PARTY DATED JULY 11ᵀᴴ, 2003



**SSY**
SIMPSON SPENCE & YOUNG
NEW YORK

## CLAUSE 85: CONTINUED:

(E)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation. See Clause 56.

## CLAUSE 86: BIMCO STANDARD ISM CLAUSE:

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.
Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by the failure on the part of the Owners or "The Company" to comply with ISM Code shall be for the Owners' account.

## CLAUSE 87: BIMCO STANDARD YEAR 2000 CLAUSE:

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000, without prejudice to their other rights, obligations and defenses under this contract including, where applicable, those of the Hague or Hague-Visby Rules, Owners and Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this contract.

**O W N E R S**                                    **C H A R T E R E R S**

PER AUTHORITY OF
OCEANTRADE CORPORATION
BY BULKAMERICA CORPORATION

AS AGENTS ONLY

21

# SECOND ORIGINAL

## RIDER CLAUSES TO THE M/V 'AMBER K'
### OCEANTRADE
### CHARTER PARTY DATED JULY 11TH, 2003



## CLAUSE 85: CONTINUED:

(E)     The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation. See Clause 56.

## CLAUSE 86: BIMCO STANDARD ISM CLAUSE:

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by the failure on the part of the Owners or "The Company" to comply with ISM Code shall be for the Owners' account.

## CLAUSE 87: BIMCO STANDARD YEAR 2000 CLAUSE:

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000, without prejudice to their other rights, obligations and defenses under this contract including, where applicable, those of the Hague or Hague-Visby Rules, Owners and Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this contract.

**O W N E R S**

**D O O Y A N G   L I M I T E D**
SEOUL, KOREA

S.  K.  KIM  /  D.  G.  Manager
BUSINESS DEPT 1

**C H A R T E R E R S**

PER AUTHORITY OF
OCEANTRADE CORPORATION
BY BULKAMERICA CORPORATION

AS AGENTS ONLY

21

EXHIBIT 2

BULKAMERICA CORPORATION
137 Rowayton Avenue
Suite 420
Rowayton, Connecticut
USA 06853

As Agents for
OCEANTRADE CORPORATION

TO:                   EVAN GALANIS
COMPANY:              SSY-NY
E-MAIL:               SSYUSA@SNET.NET
DATE:                 May 27, 2004
FROM:                 LORI ANN PANTALEO
NUMBER OF PAGES:      3

### REVISED -  FINAL HIRE STATEMENT

DOOYANG / OCEANTRADE
M/V AMBER K
C/P DTD 07/11/03                                              REVISED 6/17/2005

| | | | | | | |
|---|---|---|---|---|---|---|
| HIRE PAYMENT #13: | FROM:<br>TO: | 16-Jul-03<br>08-Jan-04 | 23:42 HRS GMT<br>11:00 HRS GMT | | | |
| 175.470833 DAYS @ | | $14,150 | | | USD | 2,482,912.29 |
| ADDRESS COMMISSION | | | @ | 3.75% | USD | (93,109.21) |
| BROKERAGE COMMISSION | | | @ | 1.00% | USD | (24,829.12) |
| | | | | | USD | 2,364,973.96 |
| | | | | | | |
| OFF-HIRE #1: | FROM: | 20-Sep-03 | 07:30 HRS GMT | | | |
| AWAITING CREW | TO: | 20-Sep-03 | 12:00 HRS GMT | | | |
| MEMBER | | | | | | |
| 0.187500 DAYS @ | | $14,150 | | | USD | (2,653.13) |
| ADDRESS COMMISSION | | | @ | 3.75% | USD | 99.49 |
| BROKERAGE COMMISSION | | | @ | 1.00% | USD | 26.53 |
| IFO | 2.2 MT X 0.1875 | X USD 170.00 | | | USD | (70.13) |
| MDO | 1.0 MT x 0.1875 | X USD 270.00 | | | USD | (50.63) |
| | | | | | USD | (2,647.87) |
| | | | | | | |
| OFF-HIRE #2: | FROM: | 03-Nov-03 | | | | |
| SHUAIBA | TO: | 07-Nov-03 | | | | |
| GRAB FAILURE | | | | | | |
| 0.757000 DAYS @ | | $14,150 | | | USD | (10,711.55) |
| ADDRESS COMMISSION | | | @ | 3.75% | USD | 401.68 |
| BROKERAGE COMMISSION | | | @ | 1.00% | USD | 107.12 |
| IFO | 2.2 MT X 0.7570 | X USD 170.00 | | | USD | (283.12) |
| MDO | 5.5 MT x 0.7570 | X USD 270.00 | | | USD | (1,124.15) |
| | | | | | USD | (11,610.02) |
| | | | | | | |
| STEVEDORE STANDBY EXPENSES: | | | | | | |
| 72.66 HOURS @ USD 250.00 / HOUR | | | | | USD | (18,165.00) |
| | | | | | USD | (18,165.00) |
| | | | | | | |
| DELIVERY BUNKERS: | | | | | | |
| IFO | | 720.670 | @ | $170.00 /MT | USD | 122,513.90 |
| MDO | | 61.140 | @ | $270.00 /MT | USD | 16,507.80 |
| | | | | | | 139,021.70 |
| | | | | | | |
| REDELIVERY BUNKERS: | | | | | | |
| IFO | | 520.430 MT | @ | $170.00 /MT | USD | (88,473.10) |
| (SUPPLIED BY OWNER) | | 149.279 MT | @ | $204.00 /MT | USD | 30,452.92 |
| MDO | | 32.800 MT | @ | $270.00 /MT | USD | (8,856.00) |
| | | | | | USD | (66,876.18) |
| | | | | | | |
| ADDITIONAL WAR RISK PREMIUM: | | | | | | |
| SHUAIBA | | | | | USD | 3,998.57 |
| | | | | | USD | 3,998.57 |

**LIME WASH MATERIAL EXPENSE:**

| | | | | |
|---|---|---|---|---:|
| DILISKELESI | | | USD | 102.50 |
| | | | USD | 102.50 |

**HOLD CONDITION:**

| | | | | |
|---|---|---|---|---:|
| AFTER SANTOS | | | USD | 3,000.00 |
| AFTER JEDDAH | | | USD | 3,000.00 |
| AFTER SHUAIBA | | | USD | 3,000.00 |
| AFTER LIANYUNGANG | | | USD | 3,000.00 |
| AFTER OKKE | | | USD | 3,000.00 |
| !LOHC | | | USD | 4,500.00 |
| | | | USD | 19,500.00 |

**SURVEYS:**

| | | | |
|---|---|---|---:|
| ON-HIRE | | USD | |
| OFF-HIRE  (USD 700.00 * 75%) | | USD | (525.00) |
| | | | (525.00) |

**COMMUNICATION/VICTUALLING/ENTERTAINMENT:**

| | | | | |
|---|---|---|---|---:|
| 175.28333 DAYS @ | $ | 1,200 | USD | 7,011.33 |
| | | | USD | 7,011.33 |

**OWNERS ITEMS:**

| | | | | |
|---|---|---|---|---:|
| INV DTD 09/04/03 | GIBRALTAR | | USD | (469.99) |
| CASH TO MASTER | JEDDAH | ($60,000 + 624.00 FEES + 2.5% COMM.) | USD | (62,139.60) |
| !NV DTD 11/17/2003 | SANTOS | | USD | (1,065.99) |
| INV DTD 11/17/2003 | SANTOS | | USD | (719.30) |
| INV DTD 11/17/2003 | JEDDAH | | USD | (3,974.73) |
| CASH TO MASTER | LIANYUNGANG | (PER OWNERS REQUEST) | USD | (30,842.25) |
| | | (USD 30,000 + 90.00 FEES + 2.5% COMM.) | | |
| INV DTD 05/27/04 | SHANGHAI, CHINA | | USD | (278.64) |
| !NV DTD 05/27/04 | HONGAI, VIETNAM | | USD | (82.00) |
| INV DTD 08/20/04 | OKKE, KOREA | | USD | (290.52) |
| CASH TO MASTER | SHUAIBA | 4/11/2003 | USD | (15,375.00) |
| OWNERS EXPENSES | SHUAIBA | 4/11/2003 | USD | (1,939.72) |
| !NV DTD 03/01/2005 | LIANYUNGANG | | USD | (756.92) |
| INV DTD 03/01/2005 | MORMUGAO | | USD | (179.26) |
| INV DTD 04/15/2005 | SHUAIBA | | USD | (1,939.72) |
| | | | USD | (120,053.64) |

**REMITTANCES:**

| | | | | |
|---|---|---|---|---:|
| CH #1: | 21-Jul-03 | | USD | (341,790.00) |
| CH #2: | 4-Aug-03 | | USD | (202,768.00) |
| CH #3: | 14-Aug-03 | | USD | (202,768.00) |
| CH #4: | 3-Sep-02 | | USD | (202,768.00) |
| CH #5: | 12-Sep-03 | | USD | (202,298.00) |
| CH #6: | 29-Sep-03 | | USD | (199,857.00) |
| CH #7: | 14-Oct-03 | | USD | (143,628.00) |
| CH #8: | 28-Oct-03 | | USD | (198,769.00) |
| CH #9: | 13-Nov-03 | | USD | (212,766.00) |
| CH #10: | 27-Nov-03 | | USD | (197,008.00) |
| CH #11: | 16-Dec-03 | | USD | (111,494.00) |
| CH #12: | 5-Jan-04 | | USD | (67,590.00) |
| CH #13: | 30-Jan-04 | | USD | (73,434.00) |
| | 4-Feb-04 | | USD | (4,653.00) |
| | | | USD | (2,361,591.00) |

| | | | |
|---|---|---|---:|
| **DUE TO CHARTERERS:** | | **USD** | **(46,860.65)** |

PLEASE HAVE OWNERS REMIT HIRE BY WIRE TRANSFER AS FOLLOWS:

UBS (THE UNION BANK OF SWITZERLAND)
ZURICH HEAD OFFICE, ZURICH SWITZERLAND
SWIFT ADDRESS:      UBSWCHZH80A
FOR FURTHER CREDIT: UBS AG
                    BAARSTRASSE 14A
                    ZUG, SWITZERLAND  6301
ACCOUNT NO.:        273-283515.60Y
IBAN:               CH53 0027 3273 2835 1560 Y
FOR CREDIT TO:      OCEANTRADE CORPORATION

REFERENCE:          M/V AMBER K - DOOYANG - C/P DTD 07/11/2003

BEST REGARDS,
BULKAMERICA CORPORATION
AS AGENTS ONLY